## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARK G. COWENS                       Case No. 1:18-cv-251
     Plaintiff,                        Black, J.
                                     Litkovitz, M.J.

      vs.


COMMISSIONER OF                      **REPORT AND**
SOCIAL SECURITY,                     **RECOMMENDATION**
     Defendant.


Plaintiff Mark G. Cowens brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI).  This matter is before the Court on plaintiff's Statement of Errors (Doc. 11), the Commissioner's response in opposition (Doc. 16), and plaintiff's reply memorandum (Doc. 17).

## I.  Procedural Background

Plaintiff filed his applications for DIB and SSI in August 2014, alleging an onset date of disability of February 23, 2013, due to a back injury, multiple ruptured discs in his spinal column, loss of feeling in his right leg, arms, and hands, and headaches.  After initial administrative denials of his claim, plaintiff was afforded a hearing before administrative law judge (ALJ) Aubri Masterson on March 21, 2017.  On May 4, 2017, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.  *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B.  The Administrative Law Judge's Findings

Plaintiff initially filed applications for DIB and SSI in February 2011, alleging an onset date of disability that same month.  ALJ Ena Weathers issued a decision on February 22, 2013, finding plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 63-76).

In rendering her decision on plaintiff's subsequent DIB and SSI applications, ALJ Masterson stated she was bound under principles of administrative *res judicata* by ALJ Weather's prior findings, absent new and material evidence or changed circumstances, pertaining to plaintiff's residual functional capacity (RFC).[1]  (Tr. 23, citing Acquiescence Ruling (AR) 98-4(6); *Drummond v. Commissioner of Social Sec.*, 126 F.3d 837 (6th Cir. 1997)).  ALJ Masterson imposed additional restrictions to those found by ALJ Weathers based upon plaintiff's hearing

---

[1] ALJ Weathers found that from February 4, 2011, through the date of her decision, plaintiff retained the RFC to perform: "light work [] . . . except [he] could frequently climb ramps or stairs, kneel, and crouch; however, he could only occasionally climb ladders, ropes, or scaffolds, stoop, and crawl.  [He] is also limited to frequent handling and fingering with his right upper extremity and no use of foot controls with the right lower extremity. Additionally, [he] should avoid all exposure to hazards, such as work around unprotected heights, heavy moving machinery, and commercial driving.  Finally, [he] could perform simple, routine tasks without strict production demands and only occasionally interact with supervisors, co-workers, and the general public."  (Tr. 68).

3

testimony, including a prohibition on climbing ladders, ropes, or scaffolds; a limitation to occasional stooping and frequent kneeling, crouching, and climbing ramps and stairs; a limitation that plaintiff cannot balance on narrow, slippery, or erratically moving surfaces or uneven terrain; and a limitation that plaintiff can tolerate only occasional interaction with coworkers and the general public and have frequent interaction with supervisors during a probationary period at work, after which he should have only occasional interaction with supervisors. (Tr. 23).

ALJ Masterson applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2013.

2. [Plaintiff] has not engaged in substantial gainful activity since February 23, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. [Plaintiff] has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, a combination of right hand laceration with right hand numbness, coronary artery disease, hypertension (severe in combination with back and heart conditions), depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, [the ALJ] finds that [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders, ropes, or scaffolds. [Plaintiff] can occasionally stoop and can frequently kneel, crouch, and climb ramps and stairs. He cannot balance on narrow, slippery, or erratically moving surfaces or uneven terrain. [Plaintiff] can frequently handle and finger bilaterally. He cannot use foot controls with the right lower extremity and must avoid all exposure to hazards such as work around unprotected heights, work around heavy moving machinery, and commercial driving. [Plaintiff] is limited to performing simple, routine tasks without strict production demands. [Plaintiff]

4

can tolerate only occasional interaction with coworkers and the general public. He can have frequent interaction with supervisors during a probationary period at work, after which he should have only occasional interaction with supervisors.

6. [Plaintiff] is unable to perform any of his past relevant work (20 CFR 404.1565 and 416.965).[2]

7. [Plaintiff] was born [in] . . . 1964, and he was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. [Plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has at least a high school education and can communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled" whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from February 23, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-25).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

---

[2]Plaintiff's past relevant work was as a licensed practical nurse, a medium exertion, skilled position. (Tr. 24, 371).

[3]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as marker (433,000 jobs nationally) and folder (39,000 jobs nationally) and sedentary, unskilled jobs such as lens inserter (241,000 jobs nationally), document preparer (66,000 jobs nationally), and surveillance system monitor (16,000 jobs nationally). (Tr. 25, 53-55).

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### C.  Evidence of Record

Dr. Grady Campbell, M.D., is plaintiff's treating family physician.  In June 2011, Dr. Campbell noted that plaintiff had a long history of back pain after sustaining a work-related injury.  Dr. Campbell noted plaintiff's pain was mostly confined to the thoracic lumbar sacral

area but recently it had involved his neck and lower spine. (Tr. 434). Dr. Campbell noted that

plaintiff underwent multiple treatments, including physical therapy, an epidural steroid injection,

pain management, and narcotic treatment. At that time, plaintiff was trying to obtain Social

Security benefits. He had been stable on OxyContin and Vicodin. (*Id.*). Plaintiff's physical

exam was normal, and Dr. Campbell continued plaintiff's medications. (Tr. 435). Dr. Campbell

encouraged plaintiff to follow through with seeking Social Security benefits. (*Id.*)

Plaintiff underwent a cervical epidural steroid injection on February 28, 2012. (Tr. 437).

A cervical spine MRI taken in July 2013 showed degenerative disc disease predominately

at C5-6 and C6-7 producing severe bilateral C6 and C7 foraminal stenosis and mild central

stenosis at C5-6 with minimal flattening of the spinal cord. (Tr. 445). A lumbar spine MRI

revealed moderate diffuse disc bulging at L5-S1 and narrowing of the left L5 foramen. (*Id.*).

In December 2013, plaintiff was seen by Dr. Campbell for a follow-up of his continued

lower back and neck pain. At that time, he had seen a pain specialist and was taking the

medications OxyContin, Vicodin, and Neurontin. (Tr. 431). Physical examination revealed mild

decreased range of motion of the neck and moderate discomfort on percussion of the thoracic

and lumbar spine. (*Id.*). Dr. Campbell expressed the most concern about plaintiff's hypertension

and changed his medication. (*Id.*).

In June 2014, Dr. Campbell examined plaintiff and noted he had spasms along the

paraspinal musculature involving both the lumbar and thoracic spine. (Tr. 429). Plaintiff also

exhibited thoracic and lumbar tenderness. He was advised to see a pain specialist. (Tr. 429).

Plaintiff was given a second cervical epidural injection in November 2014. (Tr. 439). At

the time of the injection, examination revealed absent deep tendon reflexes in the upper

7

extremities, tenderness in the cervical spine, and decreased range of motion.  (Tr. 438).

Following this epidural injection, plaintiff returned to Dr. Campbell on November 21, 2014.  (Tr.

482).  He complained about a severe headache, noting this happened after the first epidural as

well.  Plaintiff continued to have thoracic and low back pain and increasing neck pain.  Dr.

Campbell found moderately decreased range of motion of the neck and some spasm in the

paraspinal musculature bilaterally.  He again encouraged plaintiff to see a pain specialist.  (Tr.

482).

        In January 2015, Dr. Martin Fritzhand, M.D., performed a consultative examination for

disability purposes.  (Tr. 472-78).  Plaintiff complained of constant, sharp, non-radiating low

back pain with weakness in both legs and occasional instability.  He also complained of constant,

sharp neck pain radiating to the shoulders and arms with numbness in his hands.  (Tr. 476).  On

examination, plaintiff ambulated with a limping gait using a cane, noting he would fall if he was

examined without the cane.  Plaintiff exhibited diminished straight leg raise to 50 degrees

bilaterally.  He had decreased range of motion of his hips but the remaining range of motion

studies were normal.  He had decreased sensation in the lower extremities and decreased

Achilles tendon reflexes, which were graded 1+/4+ bilaterally.  (Tr. 477).  Dr. Fritzhand assessed

chronic pain syndrome involving the neck and back and hypertension.  Dr. Fritzhand was

uncertain why plaintiff needed a walking aid given the underlying diagnoses by his long-

standing treating physician.  At that time, Dr. Fritzhand was unable to assess a functional

impairment without at least imaging studies.  Dr. Fritzhand did note, however, that plaintiff

"certainly has a significant functional impairment secondary to mental illness."  (Tr. 478).

Plaintiff saw Dr. Campbell in February 2015 for a follow-up appointment. (Tr. 480). Dr. Campbell noted that plaintiff had a history of severe thoracic, cervical, and lower back spine pain "that he's had for years." (*Id.*). Dr. Campbell reported that plaintiff continued to have moderate to severe pain in his neck, thoracic spine, and lower spine, which severely impaired his activities. (Tr. 480). Plaintiff used a cane when walking to decrease falls but still had some falling episodes. Physical examination revealed no edema and no redness, heat or tenderness of the extremities. Plaintiff exhibited moderately decreased range of motion of his cervical spine associated with moderate pain. His upper and lower extremity strength was normal. There was some muscle spasm noted along the thoracic and lumbar paraspinal musculature, which inhibited twisting, turning, and bending because of discomfort. (*Id.*). Dr. Campbell assessed lumbar strain/thoracic strain that continues to severely impair activities; cervical spine arthritis with radiculopathy, for which epidural injections provided temporary relief; depression, which was improved with medication but not completely resolved; and hyperlipidemia, which was treated with medication. (Tr. 481).

Dr. Campbell completed a physical residual functional capacity questionnaire in February 2015, in which he reported that he had seen plaintiff since 1986. (Tr. 485-89). Dr. Campbell reported that plaintiff's prognosis was poor. (Tr. 485). Dr. Campbell reported that depression affected plaintiff's physical condition; plaintiff's pain is constantly severe enough to interfere with the attention and concentration needed to perform even simple tasks; and plaintiff is incapable of low stress jobs. (Tr. 486). As for plaintiff's exertional limitations, Dr. Campbell opined that plaintiff could walk 5 city blocks slowly with a cane; he could sit 15 minutes at one time and for a total of about 2 hours in an 8-hour workday; he could stand 10 minutes at one time

and less than 2 hours in an 8-hour workday; and he could rarely lift less than 10 pounds. (Tr. 487-88). Dr. Campbell further opined that plaintiff must use a cane or other assistive device while engaging in occasional standing or walking. (Tr. 488). Finally, Dr. Campbell assessed that plaintiff would miss more than four days per month as a result of his impairments or treatment. (Tr. 489).

Plaintiff underwent a third cervical epidural steroid injection in June 2015. (Tr. 852-53).

In January 2016, plaintiff saw Grayson Sugarman, M.D., to establish primary care. (Tr. 806). Plaintiff reported a significant amount of pain because he had not been on his OxyContin. (Tr. 806). Plaintiff was "positive for anxiety and depression" and "positive for chronic debilitating back pain." (*Id.*). On examination, plaintiff was tender to palpation over the cervical spinous processes. (Tr. 808). He ambulated with a walker. (*Id.*). Plaintiff was referred back to pain management. (Tr. 809).

On March 31, 2016, plaintiff presented to Dr. John Beresh, M.D., for a pain management evaluation. (Tr. 729). He complained of low back pain, bilateral hip pain, headache, and lower neck and upper back pain, and he rated his pain as a 7-8/10 at rest. (*Id.*). On examination, plaintiff had pain with palpation of the lumbar facet; decreased range of motion of the right hip and knee; decreased range of motion of the right shoulder and hand; positive straight leg raise; and decreased right hand grip. (Tr. 730). Dr. Beresh diagnosed displacement of lumbar intervertebral disc, degeneration of lumbosacral intervertebral disc, and headache. (Tr. 730-31). He prescribed Norco and morphine. (Tr. 731).

When seen in April 2016, plaintiff continued to report pain at the level of 7/10 at rest and 8/10 with activity. (Tr. 726). Physical examination findings were similar to the previous visit.

(Tr. 727). Dr. Beresh increased plaintiff's morphine dosage and he was fitted for a lumbo-sacral orthosis to wear 30-45 minutes per day, 4-5 times daily. (Tr. 727). Plaintiff continued to treat with Dr. Beresh on a monthly basis for pain management through at least January 2017. (Tr. 709-23, 861-74).[4]

### D. Specific Errors

On appeal, plaintiff argues that the ALJ erred: (1) by failing to give controlling weight to treating physician Dr. Campbell's opinion; (2) by adopting the prior ALJ's RFC when new and material evidence showed worsening conditions; and (3) in determining that plaintiff's headaches are not a severe impairment. (Docs. 11 and 17).

### 1. The ALJ's weighing of Dr. Campbell's treating physician opinion

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Medical opinions from treating sources are generally afforded more weight than those from non-treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).

---

[4] The records of plaintiff's psychological functioning do not impact the Court's decision and will not be included in this Report and Recommendation.

11

If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must weigh the factors specified in 20 C.F.R. §§ 404.1527(c) and 416.927(c) to decide what weight to give the opinion; specifically, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Gayheart*, 710 F.3d at 376. *See also Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 (6th Cir. 2018) (citing *Wilson*, 378 F.3d at 544) (emphasis added); *see also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527[(c)]").  The ALJ's decision "must contain specific reasons for the weight given to [a] treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188, at *5.  *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  This requirement serves two purposes: (1) "it helps a claimant to understand the disposition of [his] case, especially 'where a claimant knows that his physician has deemed him disabled,'" and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Shields*, 732 F. App'x at 438 (citing *Wilson*, 378 F.3d at 544).  The Sixth Circuit has made clear that remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and when the ALJ has not *comprehensively* set forth the reasons for the weight assigned to a treating physician's opinion." *Id.* (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (emphasis added).

12

In February 2015, Dr. Campbell, plaintiff's treating primary care physician, completed a physical residual functional capacity ("RFC") questionnaire.  Dr. Campbell reported that he had seen plaintiff since 1986 and his prognosis was poor.  (Tr. 485).  Dr. Campbell reported that plaintiff's pain is constantly severe enough to interfere with the attention and concentration needed to perform even simple tasks and that he is incapable of low stress jobs.  (Tr. 486).  He reported that depression affected plaintiff's physical condition, and plaintiff's physical and mental impairments were reasonably consistent with the symptoms and functional limitations described in his report.  (*Id*.).  As to plaintiff's exertional limitations, Dr. Campbell opined that plaintiff could walk five blocks "slowly – with [a] cane"; he could sit 15 minutes at one time, for about 2 hours in an 8-hour workday; stand 10 minutes at one time and less than 2 hours in an 8-hour workday; and could rarely lift less than 10 pounds.  (Tr. 487-88).  Dr. Campbell assessed that plaintiff would likely miss work more than four days per month as a result of his impairments or treatment.  (Tr. 489).

The ALJ gave "little weight" to Dr. Campbell's opinion.  The ALJ stated that Dr. Campbell "is not trained or qualified to speak with regard to mental conditions."  (Tr. 21).  The ALJ noted that Dr. Campbell's treatment notes showed normal affect, mood, and judgment.  The ALJ gave "no weight" to Dr. Campbell's opinion on plaintiff's psychological capabilities.  The ALJ stated that Dr. Campbell's assessment of plaintiff's physical limitations "are clearly based to a large extent upon the claimant's own subjective statements to him rather than upon his own professional judgment."  (Tr. 21).  The ALJ concluded that "[t]o the degree that the findings of Dr. Campbell are given any weight, they are accommodated by finding that the claimant is limited to working within the light exertional range; cannot climb ladders, ropes, or scaffolds;

13

cannot balance on narrow, slippery, or erratically moving surfaces or uneven terrain; cannot use foot controls with the right lower extremity; and must avoid all exposure to hazards such as work around unprotected heights, work around heavy moving machinery, and commercial driving." (Tr. 21-22).

Plaintiff argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Campbell. Plaintiff alleges the ALJ erred by failing to discuss any medical evidence of record that contradicts Dr. Campbell's assessment of disabling limitations. Plaintiff further alleges that the ALJ's statement that Dr. Campbell's assessment is "clearly" based on plaintiff's subjective complaints is not supported by substantial evidence. Plaintiff also takes issue with the ALJ's decision to give no weight to Dr. Campbell's assessment related to plaintiff's attention, concentration, and stress tolerance. Plaintiff alleges Dr. Campbell's opinion was based on plaintiff's experience of pain, and not his psychological conditions, which is supported by the record. Plaintiff also argues that in any event, Dr. Campbell, as plaintiff's treating internist, was qualified to give an opinion on plaintiff's psychological condition. The Court agrees.

As an initial matter, the Court notes that the ALJ failed to mention the concept of "controlling weight" when analyzing Dr. Campbell's opinion. *See Gayheart*, 710 F.3d at 377 (finding error where the ALJ's "analysis does not explain to which aspect of the controlling-weight test [a] critique is relevant"); *see also Martin v. Colvin*, 207 F. Supp. 3d 782, 789 (S.D. Ohio 2016). Nor did the ALJ provide any analysis of the controlling weight factors—i.e., whether the opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

14

The Commissioner appears to suggest that any such failure was harmless because even though the ALJ's explanations were brief, she properly explained why she did not believe that Dr. Campbell's opinion was supported by the evidence of record.  (Doc. 12 at 11).  The Commissioner states: "As the ALJ noted, the physical limitations in [the RFC] form did not appear to be based on Dr. Campbell's 'own professional judgment' because they were unsupported by Dr. Campbell's own treatment notes, and inconsistent with the record as a whole."  (Doc. 16 at 12, citing Tr. 21).

Contrary to the Commissioner's representation, the ALJ did not analyze whether Dr. Campbell's opinion was unsupported by his "own treatment notes, and inconsistent with the record as a whole."  The ALJ did not cite to any medical evidence that the ALJ believed was inconsistent with the treating physician's opinion.  Instead, the ALJ summarily concluded that Dr. Campbell's opinion on plaintiff's physical limitations was "clearly" based on plaintiff's subjective statements and not on his own professional judgment without explaining why she reached this conclusion or giving good reasons for her conclusion.  (Tr. 21).  However, there is objective and clinical evidence in the record that contradicts the ALJ's conclusion that the treating physician's assessment was "clearly" based on plaintiff's subjective complaints.  MRI evidence from July 2013, which the ALJ fails to cite or acknowledge in her decision, shows degenerative disc disease of the cervical spine, predominately at C5-6 and C6-7, which produced "severe bilateral C6 and bilateral C7 foraminal stenosis" and mild central stenosis at C5-6 with minimal flattening of the spinal cord.  (Tr. 445).  A lumbar spine MRI that same date revealed moderate diffuse disc bulging at L5-S1 and narrowing of the left L5 foramen.  (*Id.*).  Clinical findings based on physical examinations include bilateral thoracic and lumbar spasm (Tr. 429,

480, 482, 575), decreased range of motion of the cervical spine (Tr. 431, 438, 480, 482), tenderness in the cervical region (Tr. 438, 482, 808), pain to palpation in the lumbar facet (Tr. 429, 431, 712, 864, 868), decreased range of motion in the right hip and knee (Tr. 712, 730, 864, 868), decreased range of motion in the right shoulder (Tr. 712, 730, 864, 868), decreased grip strength in the right hand (Tr. 712, 730, 864, 868), absent deep tendon reflexes in the upper extremities (Tr. 438), and positive right straight leg raise (Tr. 730, 864, 868). The ALJ failed to acknowledge or discuss these findings in assessing the weight to afford Dr. Campbell's opinion. The ALJ's failure in this regard "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407 (quoting *Rogers,* 486 F.3d at 243).

The Commissioner argues that the ALJ is not required to discuss every piece of evidence in the record, including the MRI evidence cited by plaintiff, so long as the ALJ's decision contains "the findings of facts and the reasons for the decision." (Doc. 16 at 16, citations omitted). Here, however, the ALJ's decision omits any cogent discussion of the medical evidence relating to plaintiff's physical impairments, including the objective and clinical evidence of record discussed above, to enable the Court to discern the reasons for the ALJ's decision. The ALJ's discussion of the objective evidence, which was made in connection with her weighing of plaintiff's testimony, was limited to a single comment on plaintiff's use of an ambulatory aid. The ALJ stated that plaintiff's alleged need for a cane or walker to ambulate was inconsistent with "the objective findings of several examiners," including a normal gait in August 2016 and February 2017. (Tr. 20, citing Tr. 794, 877). The ALJ did not address the objective evidence related to the limitations on functions other than walking which Dr. Campbell

16

assessed and explain why those assessed limitations are not supported.  The ALJ erred by discounting the treating source's opinion without mentioning or discussing the MRI evidence or clinical findings of Dr. Campbell and plaintiff's other medical providers.  Because the ALJ did not cite or acknowledge the MRI and clinical findings cited above, the Court cannot discern whether the ALJ simply overlooked this significant, probative evidence or discounted this evidence without explaining why.  The Court cannot say that the ALJ's conclusion that Dr. Campbell's opinion is "clearly based" on plaintiff's subjective statements is supported by substantial evidence.

The Commissioner also contends that the ALJ properly gave only little weight to Dr. Campbell's opinion because the treating physician in his RFC form "declined to even name [p]laintiff's diagnoses, describe his symptoms, discuss the nature of his pain, or identify clinical findings or objective signs despite being specifically asked about these things."  (Doc. 16 at 11, citing Tr. 485).  There are two problems with the Commissioner's argument.  First, the ALJ did not cite these alleged deficiencies as a reason to discount Dr. Campbell's opinion, and the ALJ's decision does not reflect that these factors were a basis for giving Dr. Campbell's assessment reduced weight.  Second, the Commissioner's argument ignores Dr. Campbell's handwritten notation in response to the first set of questions on the form to "send last 3 OIV."  (Tr. 485).  Attached to Dr. Campbell's RFC questionnaire are treatment records for plaintiff's last three examinations of February 25, 2015, November 21, 2014, and June 5, 2014, which set forth the very information requested in the form: plaintiff's diagnoses, symptoms, nature of plaintiff's pain, clinical findings, and treatment.  (Tr. 490-94).  Read as a whole, the ALJ could not reasonably give only little weight to plaintiff's long-time treating physician on this ground.

17

In addition, the ALJ gave no weight to Dr. Campbell's assessment as it relates to plaintiff's attention, concentration, and stress tolerance, stating that Dr. Campbell "is not trained or qualified to speak with regard to mental conditions." (Tr. 21). While Dr. Campbell may not be a mental health specialist, "his training and licensing as a family physician still made him qualified to treat and prescribe such medications for [p]laintiff." *Price v. Comm'r of Soc. Sec.*, No. 1:08-cv-15, 2009 WL 973496, at *12 (S.D. Ohio Apr. 9, 2009). *See also Wert v. Comm'r of Soc. Sec.*, 166 F. Supp. 3d 935, 946 (S.D. Ohio 2016) (treating internist's "lack of mental-health specialization does not disqualify him from opining as to [p]laintiff's mental status"). In any event, Dr. Campbell's opinion on plaintiff's ability to sustain the concentration and attention to perform simple work tasks was based on plaintiff's experience of pain. (Tr. 486). Even if Dr. Campbell's examination findings did not support a disabling level of mental health impairment, he was still qualified to give an opinion on plaintiff's ability to concentrate and attend based on plaintiff' experience of pain. Dr. Campbell's lack of mental health specialization was not a good reason for giving "no weight" to Dr. Campbell's opinion on plaintiff's ability to concentrate and attend. Even assuming the ALJ meant to discount Dr. Campbell's opinion based on his lack of specialization rather than his qualifications to offer an opinion, this would be a factor "properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2) and (5).

Finally, the ALJ's decision does not reflect that she considered the regulatory factors in assessing the weight to afford Dr. Campbell's opinion. Even if Dr. Campbell's opinion may not have been entitled to controlling weight, the ALJ was still obligated to consider the length,

nature and extent of his treatment relationship with plaintiff; the frequency of examination; his

medical specialty; the evidentiary support for the opinion and its consistency with the record; and

other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). In this case, the ALJ's decision includes no analysis of the factors in 20 C.F.R.

§§ 404.1527(c) and 416.927(c) in weighing Dr. Campbell's opinion, such as whether his

assessment is supported by the MRI evidence and treatment records and is consistent with the

record as a whole. Therefore, the Court cannot conclude that the ALJ weighed Dr. Campbell's

opinion in accordance with the regulatory factors set forth in 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).

The ALJ was obligated to articulate "good reasons" based on the evidence of record for

giving only "little weight" to Dr. Campbell's opinion if she elected not to give it controlling

weight, *Wilson*, 378 F.3d at 544, and to articulate her analysis of the evidence in such a manner

that the reviewing court might follow her reasoning. *Lowery v. Comm'r*, 55 F. App'x 333, 339

(6th Cir. 2003). The ALJ's reasons for discounting Dr. Campbell's assessment are impossible to

discern from her brief and conclusory statements (Tr. 21) and preclude "meaningful review" of

the ALJ's application of the treating physician rule. *Smith*, 482 F.3d at 875; *Wilson*, 378 F.3d at

544. The ALJ's failure to articulate the reasons for the weight given to Dr. Campbell's opinion

denotes a lack of substantial evidence. *Blakley*, 581 F.3d at 407. Accordingly, because the ALJ

failed to follow proper procedure, a remand is necessary despite the fact that the ALJ's

conclusion may ultimately be justified based upon the record evidence. *See Cole v. Astrue*, 661

F.3d 931, 939-40 (6th Cir. 2011) ("The ALJ's failure to follow agency rules and regulations

'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified

19

based upon the record.'") (quoting *Blakley*, 581 F.3d at 407).[5]  Plaintiff's first assignment of error should be sustained.

### 2.   The ALJ's Treatment of the Prior ALJ Decision

Plaintiff alleges that the ALJ erred by adopting the RFC from a prior ALJ decision because new and material evidence showing a worsening of plaintiff's conditions warranted a more restrictive RFC.  He alleges this is a violation of *Drummond v. Comm'r of Social Security*, 126 F.3d 837 (6th Cir. 1997).

In *Drummond*, the Sixth Circuit held that Social Security claimants and the Commissioner are barred from re-litigating issues that have previously been determined at the administrative level.  126 F.3d at 842.  *See also* 42 U.S.C. § 405(h) ("The findings and decision of the Commissioner of Social Security after a hearing shall be binding on all individuals who were parties to such a hearing.").  *Drummond* states that "[a]bsent evidence of improvement in a claimant's condition," the findings of an ALJ as part of a prior disability determination are binding on a subsequent ALJ in later proceedings.  126 F.3d at 842.  Under *Drummond*, the Commissioner bears the burden to prove changed circumstances so as to escape being bound by principles of res judicata.  *Id.* at 843.

Following the decision in *Drummond*, the Commissioner issued an Acquiescence Ruling mandating that ALJs in Ohio (and other states within the Sixth Circuit) follow *Drummond* by

---

[5] This is not a case of harmless error.  A procedural error is not harmless "simply because [the claimant] appears to have . . . little chance of success on the merits[.]"  *Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 438 (6th Cir. 2018) (citing *Wilson*, 378 F.3d at 546) (quotation omitted)).  Further, where the ALJ's error "makes meaningful review impossible, the violation of the good-reasons rule can never qualify as harmless error."  *Id.* (quoting *Blakley*, 581 F.3d at 409).

applying res judicata to a prior assessment of a claimant's RFC. The Acquiescence Ruling explains:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law. . . .

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

As the Commissioner points out, after plaintiff filed her federal court appeal in this case the Sixth Circuit clarified the scope of *Drummond* and the res judicata principles underlying that decision in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). The Sixth Circuit explained that res judicata applies to subsequent applications covering "the same period of time [ ] rejected by the first application" but not to an application seeking benefits for a new period of time. *Id.* at 933. The doctrine of res judicata does not bar litigation of a new claim: "Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." *Id.* (quoting *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)). This does not mean, however, that an ALJ "should completely ignore earlier findings and applications," or that principles of res judicata do not apply to subsequent administrative proceedings:

> What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. That is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application.

21

*Id.* (internal citations omitted). In other words, an ALJ may determine that the findings of a previous ALJ are valid and adopt those findings absent new and material evidence when deciding a new application which covers a different time period. *Id.* On the other hand, the principles of res judicata "do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.* This "[f]resh review is not blind review," however, and the findings of a previous ALJ remain relevant to a subsequent disability application. *Id.* at 934.

In this case, ALJ Masterson, who issued her decision before *Earley* was decided, noted that she must adopt the findings of the previous ALJ – ALJ Weathers – under *Drummond* and AR 98-4(6) unless there is new and material evidence related to those findings. (Tr. 23). ALJ Masterson applied a pre-*Earley* understanding of *Drummond* and gave plaintiff "each of the limitations found by Administrative Law Judge Weathers" with "additional restrictions based upon [plaintiff's] hearing testimony" (Tr. 23)[6]. Federal courts reviewing ALJ decisions pre-dating *Earley* "have asked whether the ALJ, despite purporting to follow *Drummond*, gave the new evidence a fresh look" so as to satisfy *Earley*. *Johnson v. Comm'r of Soc. Sec.*, No. 2:17-cv-13126, 2018 WL 6440897, at *15 (E.D. Mich. Oct. 22, 2018) (Report and Recommendation), *adopted*, 2018 WL 6434778 (E.D. Mich. Dec. 7, 2018) (collecting cases). The question,

---

[6] These additional restrictions, which ALJ Masterson stated are based upon plaintiff's hearing testimony, include a prohibition on climbing ladders, ropes, or scaffolds; a limitation to occasional stooping and frequent kneeling, crouching, and climbing ramps and stairs; a limitation that plaintiff cannot balance on narrow, slippery, or erratically moving surfaces or uneven terrain; and a "rephrased" limitation that plaintiff can have frequent interaction with supervisors during a probationary period at work, after which he should have only occasional interaction with supervisors. (Tr. 23).

therefore, is whether ALJ Masterson gave a plaintiff's application a "fresh look" so as to satisfy *Earley*, or whether she did not so that remand is appropriate. *See Johnson*, 2018 WL 6440897, at *15.

ALJ Masterson gave "significant weight" to the findings of the state agency physicians and psychologists who reviewed the record in February and June 2015 and who adopted the RFC findings of ALJ Weathers. (Tr. 23, 97, 128). ALJ Weathers gave plaintiff an RFC for light work, noting that prior to his alleged onset date of February 4, 2011, an MRI of his cervical spine revealed multi-level disc protrusions but did not indicate a neural component. (Tr. 70). ALJ Weathers also noted that when examined by Dr. Campbell in June 2011, plaintiff had normal range of motion throughout, normal motor function, and normal sensory function. (Tr. 30). She further stated that the only other back/neck-related treatment was in December 2012, with findings of some decreased range of motion and "mild" weakness in right hand grip. (Tr. 70). ALJ Weathers also noted that plaintiff described no history of problems with attention and concentration. (Tr. 72).

In contrast, the evidence submitted after ALJ Weathers' decision for a subsequent time period suggests a worsening of plaintiff's medical condition in the areas ALJ Weathers found relevant to her RFC decision. New MRI evidence from July 2013 showed severe bilateral C6 and C7 foraminal stenosis and provides the neural component lacking at the time of ALJ Weathers' decision (Tr. 445). Clinical examinations showed consistently decreased range of motion and grip strength in the right hand (Tr. 712, 716, 719, 723, 727, 730, 864, 868), and lumbar spinal abnormalities, including limping gait (Tr. 477), positive straight leg raise on the right (Tr. 478, 712, 716, 719, 723, 727, 730, 864, 868), and bilateral thoracic and lumbar spasm

23

(Tr. 429, 480, 482, 575).  Evaluations indicated a decline in plaintiff's memory and attention. (Tr. 753, 755, 836, 838-839).  This evidence suggests a worsening in plaintiff's functioning such that a more restrictive RFC than that found by ALJ Weathers may be warranted.  ALJ Masterson did not discuss this evidence in her decision or explain why it was not material to her RFC finding.  Because ALJ Masterson did not discuss the evidence that indicates a worsening in plaintiff's functioning and simply adopted ALJ Weathers' RFC in almost all relevant respects, the Court cannot say that ALJ Masterson complied with *Earley* by giving a "fresh look" to the record evidence in determining plaintiff's RFC.  A remand is warranted on this basis. Accordingly, this matter should be reversed and remanded for a re-evaluation of plaintiff's claim consistent with the Sixth Circuit's decision in *Earley*.

### 3.  **Migraine Headaches**

Plaintiff's final assignment of error asserts that the ALJ erred in determining that headaches are not a severe impairment.  Because the Court recommends that this matter be reversed and remanded for further proceedings based on plaintiff's other assignments of error, the Court declines to reach plaintiff's third alleged error.  Success on this argument would result in a remand for further proceedings, which the Court recommends for the reasons set forth above.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion.

Date:   7/8/19                                      *s/Karen L. Litkovitz*
                                                    Karen L. Litkovitz
                                                    United States Magistrate Judge

24

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARK G. COWENS                     Case No. 1:18-cv-251
        Plaintiff,                 Black, J.
                                      Litkovitz, M.J.

       vs.

COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).